## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **VICKIE WAUGH, formerly known as** | ) | |
| **VICKIE MAYS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07-CV-0446-CVE-SAJ** |
| | ) | |
| **THE WILLIAMS COMPANIES, INC.,** | ) | |
| **LONG-TERM DISABILITY PLAN,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff filed the instant civil action seeking to recover benefits and enforce her rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 et seq. ("ERISA"). Plaintiff challenges as arbitrary and capricious the decision of The Williams Companies, Inc. ("TWC"), Long-Term Disability Plan ("Plan") to terminate her long-term disability ("LTD") benefits.

## I.

Plaintiff Vickie Waugh, formerly known as Vickie Mays, brings this action pursuant to 29 U.S.C. § 1132(a)(1)(B). Plaintiff is a participant in the Plan, a self-funded employee welfare plan governed by ERISA. See Dkt. # 27, Administrative Record, at 396, 409.[1] TWC, plaintiff's former employer, is a participating company in the Plan. A.R. at 325, 327. The Administrative

---

[1]   Further citations to the Administrative Record are as follows: A.R. at ___ (page number(s)).

Committee,[2] which is the Plan Administrator, has delegated its claim administration duties to Kemper National Services, Inc. ("Kemper").  A.R. at 26, 327, 346.  Thus, Kemper has full discretionary authority as Claim Administrator to make benefit determinations under the Plan, to interpret the Plan, and to obtain from participants information necessary for the proper administration of the Plan.  A.R. at 353.  The Administrative Committee retains decisionmaking authority, however, over second-level (final) administrative appeals of benefit determinations.  A.R. at 346.

For a participant to receive LTD benefits, the participant must qualify as "Totally Disabled" as defined by the Plan.  A.R. at 330-31.  The Plan entails a two-tiered definition of "Totally Disabled" or "Total Disability."  Under the first tier, during the first twenty-four months following commencement of benefits, "Totally Disabled" or "Total Disability" means

> the determination based upon conclusive medical evidence that a significant change in a Participant's physical or mental condition due to accidental injury, sickness, mental illness, substance abuse, or pregnancy prevents a participant from performing the essential functions of such Participant's regular occupation or a reasonable employment option offered to the Participant by the Company, and as a result such Participant is unable to earn more than 60% of the Participant's pre-disability Monthly Base Compensation.

A.R. at 327-28.  Under the second tier, which governs disability determinations after the initial twenty-four month period, "Totally Disabled" or "Total Disability" is defined as

> the inability of such Participant, based upon conclusive medical evidence, to engage in any gainful occupation for which he or she is reasonably fitted by education, training or experience, as determined by the Plan [].

---

[2]     At the relevant time, TWC's Board of Directors appointed the Benefits Committee, which in turn, appointed the Administrative Committee.  Dkt. # 30, at 30.  The Plan provides that members of the Administrative Committee "shall serve without compensation for services as such."  Id. at 356.

A.R. at 328.  At least once every two years, the Plan requires any participant who is receiving monthly disability payments to provide "current medical information from his physician, or physicians the [Plan] selects, regarding the condition of his health, including evidence of such Participant's continued Total Disability."  A.R. at 341.  If a participant fails to submit such information within a reasonable period of time, the Plan may terminate LTD payments.  Id.

In this case, plaintiff began her employment with TWC in 1977.  A.R. at 38.  During her twenty-two years at TWC, plaintiff performed various computer-related jobs, including computer technician, acquisitions analyst, network administrator, systems administrator, and supervisor.  A.R. at 265.  Many of these positions required repetitive keyboarding for extended periods.  A.R. at 176. Prior to joining TWC, plaintiff worked as an administrative assistant, a computer operator, and a safekeeping clerk/teller.  A.R. at 49.  Plaintiff has a high school diploma and has approximately sixteen hours of college training.  A.R. at 49, 183.

In September 1997, plaintiff consulted Ronald Oglesby, D.O. ("Dr. Oglesby"), her primary care physician, for pain and tingling in her hands and wrists.  A.R. at 176.  He prescribed wrist splints and medication.  Id.  Plaintiff's condition failed to improve, however, and she eventually underwent two carpal tunnel release surgeries on each hand in 1998 and 1999.  Id.  Following the second surgery on each hand, on July 30, 1999, Michael Clendenin, M.D. ("Dr. Clendenin"), an orthopedic hand specialist, examined plaintiff and opined:

> I feel that this patient has reached maximum medical benefit.  The symptoms have not improved following repeat carpal tunnel surgery.  There is obvious derangement of the median nerves causing persistent symptoms.
>
> It is my medical opinion that this patient has reached maximum medical benefit.  I feel that this patient should have functional capacity evaluation and vocational retraining if indicated.  I do not feel that she is capable of returning to work as a computer analyst.  She has been released from this office.

A.R. at 57.  Dr. Clendenin received a Functional Capacity Evaluation for plaintiff on September 22, 1999.  A.R. at 133.  In the evaluation, the physical therapist found that "[t]aken at face value, [plaintiff's] scores indicate that she is unable to return to her previous job at this time and should avoid jobs requiring repetitive hand movement or lifting greater than the medium work classification."  A.R. at 134.  Effective July 27, 1999, Kemper determined that plaintiff was "Totally Disabled" under the Plan's first tier definition.  See A.R. at 33, 294.  Plaintiff began receiving monthly disability payments from the Plan as of that date.  See A.R. at 33.

In October 2000, Kenneth Trinidad, D.O. ("Dr. Trinidad"), an internist, evaluated plaintiff in conjunction with her workers' compensation case.  He opined that her condition "resulted from repetitive work at a computer keyboard eight to ten hours per day, six days per week."  A.R. at 178.  Based on his examination of plaintiff and a review of plaintiff's medical history, Dr. Trinidad believed that plaintiff had "achieved maximum medical recovery and on this date . . . [has a] permanent impairment."  Id.  Dr. Trinidad doubted that "any further therapy w[ould] substantially alter her clinical circumstances."  A.R. at 179.  Thus, Dr. Trinidad concluded that plaintiff could not return to her position at TWC "without significant job modifications such as use of a headset and voice activator for her computer."  Id.

Garrett Watts, M.D. ("Dr. Watts), an orthopedic hand specialist, also evaluated plaintiff in conjunction with her workers' compensation case.  He diagnosed plaintiff with carpal tunnel syndrome, early osteoarthritis of the hands, and probable fibromyalgia.  A.R. at 186.  He noted that plaintiff had undergone a repeat nerve conduction study on September 11, 2000, which revealed mild residual carpal tunnel syndrome.  Id.  He opined that possible fibromyalgia was the cause of

plaintiff's discomfort in her elbows and arms.  Id.  He concluded that plaintiff would not likely benefit from any further medical treatment for the condition of her hands.  A.R. at 187.

Plaintiff received a favorable decision from the workers' compensation court in May 2001. A.R. at 193.  The workers' compensation court found that, as a result of plaintiff's injuries arising from her employment, she sustained 23% permanent partial disability to the right hand and 23% permanent partial disability to the left hand.  A.R. at 194.  The court ordered TWC to pay plaintiff a lump sum and to provide her with continuing prescription medication, for both hands only, under the supervision and care of Dr. Oglesby.  Id.

In February 2002, Kemper initiated a review of plaintiff's disability claim to determine continuing eligibility for LTD benefits.  See A.R. at 307.  Kemper requested medical documentation from plaintiff's physicians.  See A.R. at 307, 309.  In July 2002, Kemper received thirty-eight pages of medical records, dated February 19, 2002 through April 1, 2002, from Dr. Oglesby.  A.R. at 311. The following month, Kemper sent these records to Lawrence Blumberg, M.D. ("Dr. Blumberg"), an orthopedic surgeon.  A.R. at 313.  Dr. Blumberg's task was to "peer review" the evidence and determine whether it supported a continued "Total Disability" determination.  Dr. Blumberg opined that the medical records failed to support functional impairments precluding work.  A.R. at 225.  Dr. Blumberg found that the records contained no objective testing such as MRI studies, EMG nerve conduction studies, neurological examination, complete physical examination with testing, or even x-rays.  Id.  Dr. Blumberg concluded that nothing in the records indicated that plaintiff could not perform "the activities of any occupation."  Id.  According to Dr. Blumberg, the claimant "[wa]s surely capable of sedentary activity at the least."  Id.

By letter dated August 26, 2002, Kemper informed plaintiff that her updated medical information did not support the continuation of LTD benefits under the Plan. A.R. at 26. Kemper advised plaintiff that she had the responsibility of providing proof of continuing disability status. Id. According to Kemper, plaintiff had failed to provide documentation supporting "a functional impairment that would preclude [her] from performing [her] own occupation as a Computer Analyst, which is sedentary in nature." A.R. at 27. Therefore, Kemper requested submission of "any additional quantitative medical documentation" plaintiff possessed, including "quantitative MRI or x-ray findings, EMG nerve conduction study findings, [or] a complete physical examination with ranges of motion, motor strength testing and neurologic evaluation." Id.

In response, plaintiff submitted additional medical records from Dr. Oglesby for the period May 8, 2002 through September 17, 2002. A.R. at 248, 315. In Dr. Oglesby's September 13, 2002 report, he began by reviewing plaintiff's medical history related to her bilateral carpal tunnel syndrome. A.R. at 238. Dr. Oglesby stated that the "most recent nerve conduction test was done on 9/11/00 showing abnormal study, electrodiagnostically consistent with bilateral mild carpal tunnel syndrome with bilateral abnormal median nerve conduction study . . . ." A.R. at 239. He described plaintiff's subjective evaluation of her symptoms and the difficulties she experienced in everyday life. See A.R. at 238-39. Plaintiff related to Dr. Oglesby that "she [wa]s also disabled because of chronic right lumbosacral back pains, which cause[d] excessive pain after 10 minutes of vacuuming." A.R. at 239. Dr. Oglesby noted that plaintiff had "fibromyalgia with chronic upper back pains and with pains of the upper extremities including the elbows and upper arms that she fe[lt] [we]re debilitating to her as well." Id. He found that plaintiff had "exquisite tenderness" with mild touch of "the volar wrists bilaterally with mild decreased sensation to tactile and pinprick

sensation of the fingertips, # 3 and # 4 . . . ." Id. He observed, however, that plaintiff had normal range of motion of the neck and normal range of motion of the lower extremities and negative sensation changes of the lower extremities." Id. With respect to "objective" evidence, Dr. Oglesby observed that the x-ray of plaintiff's cervical spine showed "significant degenerative joint disease . . . near effusion at the C5, 6 level." Id. He added that "[r]egarding her fibromyalgia condition on 5/09/01, [he] evaluated her to have 16/18 fibromyalgia tender points . . . ." A.R. at 240. Dr. Oglesby then made the following assessments: (1) "[b]ilateral carpal tunnel syndrome with failed surgery and disabling condition[,]" (2) "[l]ow back pain[,]" (3) "[f]ibromyalgia, global with associated somatic dysfunction and contributing to disability[,]" and (4) degenerative joint disease which also contributed to disability. Id. Dr. Oglesby concluded:

> I feel that she is completely disabled at this time and very likely is going to be permanent, keeping her from being able to participate in gainful employment, though I agree with reassessing her condition and trying any therapeutic aids that will help.

Id.

 Plaintiff visited Dr. Oglesby the following week "for right arm pain and neck stiffness and dizziness and low back pain associated with motor vehicle accident, which occurred [September 16, 2002]." A.R. at 242. Dr. Oglesby found that plaintiff was alert, oriented, and in no distress. Id. He stated that she ambulated without any new difficulties, had full range of motion of her neck and upper arms, and had mild tenderness in her neck, lower back, and right hip. Id. He noted a negative fabere's test and negative seated straight leg raising. Id. He observed that "lower extremity strength and upper extremity strength [we]re normal." Id. He concluded that the x-rays of plaintiff's cervical spine and right hip revealed no obvious fractures or deformities. Id. Kemper sent this report, as well as the rest of Dr. Oglesby's dictations, to Dr. Blumberg for a peer review "addendum." A.R. at 315.

7

Dr. Blumberg reviewed the new medical evidence from Dr. Oglesby and found that it failed to show functional impairments precluding work.  A.R. at 245.  Dr. Blumberg noted that the new evidence did not contain an MRI, an EMG nerve conduction study, or a complete physical examination including motor strength testing, range of motion, and a neurologic evaluation.  A.R. at 246.  He discussed the findings of Dr. Oglesby's September 13, 2002 and September 17, 2002 reports and concluded,

> Once again, based on objective documentation, there is nothing to preclude the claimant from performing any occupation.  She can sit without difficulty and can lift up to at least ten pounds.  She is therefore capable of performing at least sedentary activities.  She is therefore capable of performing any occupation.  Specific limitations would be no lifting over ten pounds on a repetitive basis.

Id.

Kemper advised plaintiff by letter dated November 12, 2002 that she no longer qualified as "Totally Disabled" under the Plan, and that her benefits would be terminated after November 30, 2002.  A.R. at 248-49.  After summarizing the newest medical documentation, Kemper informed plaintiff that she was "capable of performing at least sedentary work, which is [in] line with [he]r own occupation as a Computer Analyst."  A.R. at 249.  Kemper found that "based upon the submitted documentation, a disability [wa]s still not substantiated." Id.  As a result, Kemper advised plaintiff that if she elected to appeal the determination, she would need to submit current medical documentation that outlined specific functional abilities and established her total disability.  Id.  Such documentation might include objective data such as diagnostic test results, MRI or x-ray findings, EMG nerve conduction study findings, or a complete physical examination with ranges of motion, motor strength testing, and neurologic evaluation.  Id.

8

Plaintiff, through counsel, appealed Kemper's decision on January 10, 2003.  A.R. at 252. Plaintiff stated that she understood "Total Disability" to mean the "inability to engage in any gainful occupation for which one could be reasonably fitted by training, education, or experience."  Id. According to plaintiff, Kemper already had a complete set of her medical records.  Id.  Therefore, she enclosed only two documents with her written appeal: (1) a September 12, 2001 physical medical source statement from Dr. Oglesby, and (2) a partially favorable benefits determination by the Social Security Administration ("SSA") dated October 18, 2002.  Id.

In the SSA determination, the Administrative Law Judge ("ALJ") found that plaintiff's fibromyalgia and "residuals of multiple surgeries for carpal tunnel syndrome" rendered her disabled as defined by the Social Security Act.  See A.R. at 154, 159-60.  The ALJ discussed the findings of several doctors.  John Hickman, Ph.D., evaluated plaintiff on July 8, 2002 and found that she "would have a moderate limitation in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  A.R. at 157.  Dr. Harold E. Goldman, a "medical expert," testified that plaintiff's symptoms from her bilateral carpal tunnel syndrome had worsened with the onset of fibromyalgia.  Id.  Ann Young, Ed.D. ("Dr. Young"), a "qualified vocational expert," testified that plaintiff possessed work skills which were transferrable to sedentary work activities.  A.R. at 158.  Dr. Young believed that based on plaintiff's age, educational background, vocational history, and functional limitations, she "would be able to perform jobs such as a sedentary, unskilled information clerk with 520 such jobs in Oklahoma and 44,000 nationally."  Id. The ALJ found this number insignificant and awarded plaintiff benefits from May 1, 2001 through the date of the decision.  A.R. at 159.

On February 18, 2003, Kemper requested that two more doctors conduct peer reviews of plaintiff's claim. James Wallquist, M.D. ("Dr. Wallquist"), an orthopedic surgeon, and Anthony Riso, M.D. ("Dr. Riso"), a specialist in anesthesiology and pain management, evaluated plaintiff's functional impairments related to her "Own Occupation." A.R. at 272, 276. Drs. Wallquist and Riso examined hundreds of pages of medical records, dating as far back as 1999.[3] After extensively reciting plaintiff's medical history, Dr. Wallquist concluded that, based on a review of the medical documentation provided, "there [we]re insufficient updated quantitative objective physical findings and diagnostics to support a functional impairment that would preclude this claimant from performing the core elements of her own occupation as a computer specialist . . ." or "from engaging in any occupation after 11/30/02." A.R. at 274. Dr. Wallquist noted the following in support of his conclusion:

- August 2000 – Dr. Watts assumed plaintiff would be able to return to some type of work at TWC if she was provided with a phone headset and voice activated computer. A.R. at 273; see also A.R. at 185.

- September 2000 – An electrodiagnostic study of plaintiff's upper extremities conducted by Timothy Pettingell, M.D. ("Dr. Pettingell"), revealed that plaintiff had mild bilateral carpal tunnel syndrome with no electrodiagnostic evidence of forearm median nerve or ulnar nerve entrapment at the wrist or elbow or cervical radiculopathy. A.R. at 273; see also A.R. at 188-89.

- June 2000 – Dr. Oglesby's Attending Physician Statement stated that plaintiff had a Class 3 level of physical impairment (capable of light work only) but contained no quantitative

---

[3]   Although the doctors' peer reviews do not specifically identify the information reviewed, the June 30, 2003 Kemper Long Term Disability Appeal Summary lists the documents provided to Drs. Wallquist and Riso. See A.R. at 33-35. These documents include what appears to be all of the medical documentation received for years 1999 through 2002, including the workers' compensation court documents, the SSA decision, letters to and from plaintiff, and reports by Dr. Oglesby, Dr. Trinidad, Dr. Clendenin, and Dr. Blumberg. See id.

objective physical findings to support total disability from any occupation.  A.R. at 273; <u>see</u> <u>also</u> A.R. at 196-97.

- June 2000 – Dr. Trinidad's Attending Physician Statement stated that plaintiff had a Class 5 level of physical impairment (incapable of sedentary work) but was not supported by sufficient quantitative objective physical evidence to support that diagnosis.  A.R. at 273; <u>see</u> <u>also</u> A.R. at 198-99.

- June 2000 – Plaintiff's Long Term Disability Questionnaire indicated that plaintiff had functionality in that she admitted to performing light housework daily, grocery shopping weekly, gardening weekly, and shopping at Wal-Mart weekly, as well as driving ten miles round trip to town, cooking, reading, making beds, gardening, watching TV, doing laundry, and for the most part, dressing and performing routine hygiene without assistance.  A.R. at 273; <u>see</u> <u>also</u> A.R. at 42.

- September 2002 – Dr. Oglesby's final follow-up report revealed that plaintiff could move about without difficulty, had full cervical and upper extremity range of movement, and had no fracturing of her spine; Dr. Oglesby provided no subsequent notes with updated medical documentation or diagnostics "to support continued disability from any occupation."  A.R. at 273; <u>see</u> <u>also</u> A.R. at 243.

In Dr. Riso's peer review, he arrived at the same conclusion as Dr. Wallquist – that the evidence failed to support functional impairments precluding work.  A.R. at 276.  Dr. Riso noted that plaintiff had a history of depression, fibromyalgia, emotional lability, physical dysfunction, degenerative disease, and bilateral carpal tunnel syndrome with failed surgery.  <u>Id.</u>  He noted that plaintiff's file contained no records submitted after November 30, 2002.  <u>Id.</u>  Hence, he concluded that "there [wa]s no objective data to support that a functional impairment exists from 11/20/02 [sic] that would preclude the claimant from performing any occupation.  Should additional clinical information become available past the 11/30/02 date, I would be happy to review [it]."  A.R. at 276-77.

Kemper denied plaintiff's first-level appeal on April 2, 2003.  <u>See</u> A.R. at 281.  In the letter to plaintiff, Kemper began by reciting the two-tiered definition of "Total Disability."  <u>Id.</u>  It then listed the numerous documents reviewed on appeal and informed plaintiff of its decision to uphold

11

the denial.  Id.  Kemper stated that "[b]ased on our review there is a lack of medical information to support [plaintiff's] continued absence from work.  The most recent medical records with physical exam findings were medical records from Dr. Oglesby dated 9/13/02 and 9/17/02."  A.R. at 282.  Plaintiff's file contained "no subsequent notes from Dr. Oglesby, comprehensive orthopedic examinations, updated abnormal physical exam findings, or updated functional capacity evaluations provided to support [plaintiff's] inability to perform the essential functions of any occupation" as defined in the Plan.  Id.  Kemper advised plaintiff that if she wished to file a second-level administrative appeal, she had to provide supporting medical data, such as current exam findings, MRI results, physical therapy notes, consultation reports, orthopedic/neurological evaluations, office notes, or an updated functional capacity evaluation.  Id.

Thereafter, plaintiff, through counsel, filed a second-level appeal.  See A.R. at 284.  Plaintiff submitted no further medical records with her appeal.  Id.  She maintained that her January 10, 2003 appeal letter "fairly set[] forth [her] position on the matter."  Id.

Kemper subsequently referred plaintiff's claim to another physician for a fourth peer review.  Robert Ennis, M.D. ("Dr. Ennis"), an orthopedic surgeon, examined all of the medical records and other documents contained in plaintiff's file.  See A.R. at 290-91.  He determined – like Drs. Blumberg, Wallquist, and Riso – that plaintiff did not have functional impairments precluding work.  A.R. at 291.  Dr. Ennis noted that a pain management evaluation performed on February 18, 2003[4] indicated that plaintiff "has continued subjective evidence of discomfort, but objective evaluation does not reveal a physical impairment that would prevent the claimant from working."  A.R. at 292.

---

[4]      Dr. Ennis' reference is not clear.  The Court assumes he is referring to Dr. Riso's peer review conducted on February 18, 2003.

Dr. Ennis also noted that the file contained no recent physical examination or recent functional capacity evaluation.  Id.  Dr. Ennis concluded that "[i]n the absence of specific objective documentation of disability, it is not possible to reach a conclusion at this time that the claimant is disabled from performing any occupation currently."  Id.

The Administrative Committee convened on July 14, 2003 to render a final decision on plaintiff's appeal.  See A.R. at 18.  The Administrative Committee discussed Dr. Ennis' peer review, plaintiff's "doctors' statements, the decision by the Administrative Law Judge of the Social Security Administration, and the term 'substantial gainful employment' used by the Social Security Administration as opposed to the term 'gainful employment' used by the Plan."  A.R. at 21.  The Administrative Committee also reviewed "Dr. Trinidad's statements and rating of [plaintiff's] physical abilities, and the conclusions of the physicians who conducted Kemper Peer Reviews."  Id.  The Administrative Committee concluded that, based on all of the documentation provided, Kemper's denial of LTD benefits would be upheld.  Id.

After notifying plaintiff of the decision, the Administrative Committee received a letter from plaintiff's counsel challenging the final denial of plaintiff's appeal.  See A.R. at 4-5.  Plaintiff claimed that Kemper and TWC had been "haphazard in their procedures and result-driven in their outcome."  A.R. at 4.  According to plaintiff, on July 9, 2003, Kemper contacted her and requested a conference call with Dr. Oglesby.  Id.  Plaintiff then phoned Dr. Oglesby's office and scheduled an appointment for Monday, July 14, 2003.  Id.  Dr. Oglesby offered to participate in the conference call during plaintiff's appointment or, alternatively, later during that same week.  Id.  On Tuesday, July 15, 2003, Kemper informed plaintiff that the conference call was no longer necessary and that her claim for LTD benefits had been denied.  Id.  Plaintiff asserted that Kemper's and TWC's

failures to pursue the conference call with Dr. Oglesby or to request a complete medical examination of plaintiff (by Drs. Blumberg, Wallquist, Riso, or Ennis) showed that the administrative review was results-driven.  A.R. at 5.

In response to this letter, the Administrative Committee reconsidered plaintiff's appeal at a meeting on August 11, 2003.  See A.R. at 11, 13.  The Administrative Committee discussed the allegations in the letter, the legality of the Administrative Committee's position and the decision-making process, and the various approaches to drafting denial letters. A.R. at 13.  "Some discussion was had regarding whether a peer-to-peer review was necessary at this time, and a decision was made not to pursue the review."  Id.  The Administrative Committee elected to reconfirm its reasons for denying plaintiff's appeal in a final letter to plaintiff.  Id.

The August 29, 2003 letter stated that the Administrative Committee had reaffirmed its denial decision based on the terms of the Plan and "the more than sufficient" medical and other evidence reviewed.  A.R. at 1.  The Administrative Committee found that a conference call with Dr. Oglesby was no longer necessary and apologized for any inconvenience.  Id.  After noting that plaintiff had received benefits for the initial twenty-four month period under the first tier definition of "Total Disability," the Administrative Committee explained its rationale for denying LTD benefits under the second tier definition:

> After the first 24 months of coverage, the Plan provides that [plaintiff] must be prevented by her disability from performing the essential functions of '**any gainful occupation**' that she is reasonably fitted by her training, education, and experience to perform.  This second tier standard for disability is much more difficult to satisfy, and the record has persuaded the Committee that [plaintiff's] difficulties, though serious, do not satisfy this second tier definition.  The reports of at least eight doctors, including four orthopedic surgeons and [plaintiff's] own physician, Dr. Oglesby, and the decisions of both the Workers' Compensation Court and the Administrative Law Judge for the Social Security Administration are all consistent on one point.  None of them conclude that [plaintiff] cannot do any job.  So long as

14

> she can do any job for which her computer skills and experience make her reasonably fitted, she is not disabled under the second, more rigorous Plan definition.

A.R. at 2 (emphasis in original).  The Administrative Committee found that, according to the medical records, plaintiff may be a candidate for vocational retraining, can possibly sit, stand, and walk for eight hours in an eight hour workday, and has been cleared to lift and to carry up to ten pounds.  Id.  The Administrative Committee found that plaintiff has been referred to a medical rehabilitation or therapy program, "has perhaps only moderate functional limitations[,] and is only partially impaired."  A.R. at 2-3.  The Administrative Committee further found that the evidence showed that plaintiff is capable of at least light, sedentary work, and some of the medical reports suggested that plaintiff "could even return to work in her former position as a computer analyst if certain accommodations were available." A.R. at 3. Thus, the Administrative Committee concluded that plaintiff is not entitled to continued LTD benefits.  Id.  Plaintiff subsequently filed this lawsuit alleging that the Plan's decision violates ERISA.  See Dkt. # 2.

## II.

As a preliminary matter the Court must establish the proper standard of review for plaintiff's ERISA claim.  Plan beneficiaries, like plaintiff, have the right to federal court review of benefit

15

denials and terminations under ERISA.[5]  "ERISA was enacted to promote the interests of employees

and their beneficiaries in employee benefit plans."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S.

101, 113 (1989).  Specifically, 29 U.S.C. § 1132(a)(1)(b) grants plaintiff the right "to recover

benefits due to [her] under the terms of the plan, to enforce [her] rights under the terms of the plan,

or to clarify [her] rights to future benefits under the terms of the plan."  The default standard of

review is de novo.  However, when a plan gives the plan administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of a plan – as here – a

challenge under § 1132(a)(1)(B) is to be reviewed under an arbitrary and capricious standard.[6]  See

Firestone, 489 U.S. at 115 (applying a deferential standard of review when the plan administrator

or fiduciary has discretionary authority to determine eligibility for benefits or to construe the terms

of a plan).  Under the "pure" version of this standard, a plan administrator's or fiduciary's decision

will be upheld "so long as it is predicated on a reasoned basis."  Adamson v. Unum Life Ins. Co. of

Am., 455 F.3d 1209, 1212 (10th Cir. 2006).  That basis "need not be the only logical one nor even

---

[5]     The Tenth Circuit has unequivocally ruled that an ERISA claimant does not have a right to jury trial on his or her claim to recover unpaid benefits.  Adams v. Cyprus Amax Minerals Co., 149 F.3d 1156 (10th Cir. 1998).

   The summary judgment process focuses on the existence or lack of genuine issues of material fact for trial.  In contrast, in ERISA cases reviewing denial of benefits based on the administrative record, the judgment rendered, like a judgment in appellate settings, is not a "summary" judgment, but a judgment after full review of the administrative record.  ERISA claims challenging  the denial of benefits are typically replete with disputed questions of material fact which must be resolved by reference to the administrative record or remanded to the plan administrator for further proceedings.

[6]     In ERISA cases, the decisionmaker is generally referred to as a "plan administrator." However, the Plan Administrator in this case, the Administrative Committee, delegated a large part of its decisionmaking authority to Kemper.  Kemper managed claims and made eligibility determinations, while the Administrative Committee retained decisionmaking authority only with regard to second-level (final) administrative appeals.

the best one." Nance v. Sun Life Assur. Co. of Can., 294 F.3d 1263, 1269 (10th Cir.2002) (quoting Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir.1999)).  The decision merely must "reside[] 'somewhere on a continuum of reasonableness-even if on the low end." Adamson, 455 F.3d at 1212 (quoting Kimber, 196 F.3d at 1098).  A plan's decision will not be set aside "if it was based on a reasonable interpretation of the plan's terms and was made in good faith." Trujillo v. Cyprus Amax Minerals Co. Ret. Plan Comm., 203 F.3d 733, 736 (10th Cir. 2000).

By contrast, "[i]ndicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by a fiduciary." Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002).  The Tenth Circuit has held that "'[s]ubstantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].'  Substantial evidence requires 'more than a scintilla but less than a preponderance.'" Sandoval v. Aetna Life & Cas. Inc. Co., 967 F.2d 377, 382 (10th Cir. 1992) (citation omitted).  In reviewing the plan administrator's or fiduciary's decision, the reviewing court generally is "limited to the 'administrative record' – the materials compiled by the [decisionmaker] in the course of making [the] decision." Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002).  The reviewing court should give less deference to a decision if the plan administrator or fiduciary fails to gather or to examine relevant evidence. Caldwell, 287 F.3d at 1282.

If an ERISA fiduciary plays more than one role – i.e., deciding eligibility and paying benefits claims out of its own pocket – a conflict of interest arises. Fought v. Unum Life Ins. Co. of Am., 379 F.3d 997, 1005 (10th Cir. 2004); see Pitman v. Blue Cross Blue Shield of Okla., 217 F.3d 1291, 1296 n.4 (10th Cir. 2000) ("[I]n Blue Cross' situation, as both insurer and administrator of the plan,

there is an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound); Slocum v. UNUM Life Ins. Co. of Am., No. 06-1143-JTM, 2007 WL 2461690, *4 (D. Kan. Aug. 28, 2007) ("The 'standard conflicts of interest' most commonly involve situations where insurance is not involved and where the company itself is funding the plan and where its employees may be acting as either the plan administrator or the review committee responsible for reviewing and approving applications for benefits.").  Under the two-tier "sliding scale" approach adopted by the Tenth Circuit, "the reviewing court will always apply an arbitrary and capricious standard, but the court must decrease the level of deference given" to benefits decision "in proportion to the seriousness of the conflict."  Fought, 379 F.3d at 1004.  The claimant has the burden of proving that "the plan administrator's dual role jeopardized his impartiality." Id. at 1005 (internal quotation marks and citation omitted).  The Tenth Circuit traditionally applies four factors in determining the seriousness of a conflict: (1) whether the plan is self-funded; (2) whether the company funding the plan appointed and compensated the plan administrator; (3) whether the plan administrator's performance reviews or level of compensation were tied to the denial of benefits; and (4) whether the provision of benefits significantly impacted the finances of the company administering the plan. Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan, 379 F.3d 1168, 1175 (10th Cir. 2004).  Very recently, however, the United States Supreme Court has held that an employer's or insurer's dual-role conflict is "a factor in determining whether the plan administrator has abused its discretion in denying benefits; . . . the significance of the factor will depend upon the circumstances of the particular case." Metro. Life Ins. Co. v. Glenn, ___ S. Ct. ___, 2008 WL 2444796, at *3 (June 19, 2008).

Here, this case does not present such a conflict of interest.  Plaintiff concedes that the "Plan Administrator . . . is not a conflicted administrator."[7]  Dkt. # 32, at 12.  The Plan Administrator does not "wear two hats."  <u>Fought</u>, 379 F.3d at 1005 (internal quotation marks and citation omitted).  The entity which actually pays claims is not the same entity which administers claims and makes initial eligibility and first-level appeal determinations.  Further, the Court finds that to the extent the Tenth Circuit's four factors apply because the Plan Administrator considers second-level appeals,[8] the record contains no evidence that the Plan Administrator operated under a serious conflict of interest when denying plaintiff's claim.  While the Plan: (i) is self-funded, and TWC (ii) appointed and

----

[7]    Plaintiff also asserts that the scope of review is the same in this case as in <u>Torix v. Ball Corp.</u>, 862 F.2d 1428 (10th Cir. 1988).  Dkt. # 22, at 23.  The court in <u>Torix</u> applied the pure arbitrary and capricious standard of review.  <u>See</u> 862 F.2d at 1429 ("The key to this case, therefore, is a determination whether the committee's decision represented a reasonable and good faith interpretation of the plan's terms.").

[8]    The Court chooses this verbiage for two reasons.  First, Tenth Circuit precedent is unclear as to whether the four factors apply to determine the <u>seriousness</u> of a conflict or whether they apply to determine the <u>existence</u> of a conflict.  <u>Compare</u> <u>Fought</u>, 379 F.3d at 1005 ("If the plaintiff cannot establish a <u>serious</u> conflict of interest, we consider defendant's standard conflict of interest as one factor . . . ." (emphasis added)), <u>with</u> <u>Pitman</u>, 217 F.3d at 1295-96 (considering the four factors in determining whether Blue Cross, the plan administrator and insurer, operated under an inherent conflict of interest), <u>and</u> <u>Finley</u>, 379 F.3d at 1175 (applying the four factors in determining whether an independent third-party administrator was subject to a conflict of interest in denying benefits under the self-funded plan).  Second, the Court is unsure as to what effect, if any, the Supreme Court's recent pronouncement will have on the Tenth Circuit's four factors.  <u>See</u> <u>Metro. Life Ins.</u>, 2008 WL 244796, at *8 ("Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly on the evaluator/payor conflict.  In principle . . . conflicts are but one factor among many that a reviewing judge must take into account.").

compensated the Administrative Committee as employees,[9] and (iii) appointed and likely compensated Kemper as the Claims Administrator, there is no evidence in the record that these decisionmakers "receive financial or evaluative incentives for denying claims" or that the provision of benefits has a significant impact on either Kemper or TWC. Finley, 379 F.3d at 1175. Thus, this is not a basis for the Court to reduce its level of deference to the Plan's decision. Id.

Nevertheless, plaintiff argues that the existence of serious procedural irregularities gives rise to a conflict of interest, which should "be considered as one factor."[10] Dkt. # 32, at 12. Plaintiff argues that "two items jump out that require the Court to give the Plan Administrator . . . less deference." Id. Plaintiff claims that the doctors' "perfunctory" peer reviews qualify as serious procedural irregularities. Id. at 13. Plaintiff further claims that defendant's failure to hold a "telephone conference between Dr. Oglesby and the reviewing doctors" constitutes a serious procedural irregularity. Id. Plaintiff cites no authority in support of her contention that these "items" qualify as serious procedural irregularities.

The Tenth Circuit has held that "when a serious procedural irregularity exists, and the plan administrator has denied coverage, an additional reduction in deference is appropriate." Fought, 379 F.3d at 1006. Under this standard, the burden shifts to the fiduciary to prove "the reasonableness

---

[9]    Defendant notes that TWC compensates members of the Administrative Committee solely as employees and not "for their service as members of the [Administrative Committee]." Dkt. # 30, at 30. The mere fact that the Plan Administrator (Administrative Committee) consists of a committee of employees of the Plan sponsor does not create an inherent conflict of interest. See Pitman, 217 F.3d at 1296 n.4 (10th Cir. 2000).

[10]    Plaintiff's argument is legally inaccurate. Serious procedural irregularities do not give rise to a conflict of interest that is weighed as a factor. Instead, as explained infra, serious procedural irregularities provide an independent ground for "lessening deference" and entail a separately enhanced standard of review. Gaither v. Aetna Life Ins. Co., 388 F.3d 759, 768 (10th Cir. 2004).

of its decision pursuant to th[e] [] traditional arbitrary and capricious standard." Id.  The fiduciary must show "that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence."  Id.  In such instances, the reviewing court must "take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case . . . ."  Id.  The Tenth Circuit has found that a serious procedural irregularity exists where an inherently conflicted plan administrator fails to conduct an independent review in a complex ERISA case.  Fought, 379 F.3d at 1007.  More recently, however, the Tenth Circuit has noted that a serious procedural irregularity does not arise "in every instance where the plan administrator's conclusion is contrary to the result desired by the claimant."  Adamson, 455 F.3d at 1214; see Grosvenor v. Qwest Commc'ns Int'l, 191 Fed. Appx. 658, 662 (10th Cir. 2006) (unpublished decision) ("A serious procedural irregularity is not present every time a plan administrator comes to a decision adverse to the claimant on conflicting evidence.").[11]  The irregularity must raise "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim."  McGarrah v. Hartford Life Ins. Co., 234 F.3d 1026, 1031 (8th Cir. 2000).

The Court finds that the purported irregularities do not raise serious doubts as to the veracity of the Plan's decision.  Unlike in Fought, 379 F.3d at 1007, the Plan Administrator is not inherently conflicted and certainly did not fail to conduct an independent investigation.  The Plan initiated four peer reviews and made numerous requests for current objective medical evidence.  The fact that the

---

[11]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

four reviewing doctors' repeatedly noted the lack of objective evidence and the fact that the Plan did not hold a conference call do not, without more, raise "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." McGarrah, 234 F.3d at 1031.  The Court concludes, therefore, that plaintiff received a full and fair review of her claim for LTD benefits.  The Court will not reduce the level of deference based on a serious procedural irregularity.  The "pure" arbitrary and capricious standard of review applies.

### III.

Plaintiff asserts numerous bases as to why the Plan's denial of LTD benefits was arbitrary, capricious, and not supported by even a scintilla of evidence.  Dkt. # 22, at 26.  Plaintiff claims that the Plan's interpretation of "Total Disability" was overly restrictive.  Id. at 26.  Plaintiff claims that the Plan ignored credible evidence.  Dkt. # 32, at 2, 10.  Plaintiff claims that the four peer reviews were conclusory and "jaundice[d]."  Dkt. # 22, at 26, 29.  According to plaintiff, "once a person has been determined disabled, particularly for a position such as the one [she] had, there need [sic] be more than simply a skeptically [sic] review of medical records to justify a denial."  Id. at 2.  Plaintiff further claims that "the fiduciary did not feel [sic] its appropriate role to consider the interest of a deserving beneficiary as it would its own[,]" Dkt. # 22, at 29; the Plan should not have acted as an adversary and should not have declined the conference call with Dr. Oglesby "when a little more evidence from Dr. Oglesby might have gotten to the truth of the matter[,]" id. at 28.  Plaintiff concludes that "if the simple in-house peer reviews of doctors who have never seen the claimant, nor discussed her conditions with doctors who have [sic] actually have, can constitute more than a scintilla of evidence, then judicial review of an ERISA case is nothing more than a sham."  Dkt. # 32, at 13.

By contrast, the Plan argues that its decision denying LTD benefits is supported by substantial evidence in the administrative record, and that plaintiff has failed to meet her burden. Dkt. # 30, at 32, 37.  The Plan does not deny that plaintiff has various medical conditions.  Id. at 32.  The Plan contends, however, that plaintiff's medical conditions, "as of December 1, 2002 (at least)," did not prevent her from "engaging in a gainful occupation for which she was reasonably fitted by education, training or experience."  Id.  The Plan argues that it did not have to give controlling weight to the opinions of plaintiff's treating physicians – "particularly in light of the overwhelming evidence in the record . . . that plaintiff was indeed capable of engaging in gainful employment, even if vocational counseling or rehabilitation would have been required, or even if she might have had to move out of state to find work."  Id. at 35.  The Plan further argues that there is no evidence that it applied or interpreted the term "Total Disability" in an unduly or overly restrictive manner, or that it failed to consider all of the evidence.  Id. at 37.  Finally, the Plan contends that its failure to have a conference call with Dr. Oglesby and its lack of an independent medical examination do not justify reversal.  Id. at 39.  According to the Plan, the Administrative Committee did not need a conference call with Dr. Oglesby because four other doctors already had opined that Dr. Oglesby's records did not contain sufficient objective medical evidence.  Id.  The terms of the Plan did not require, moreover, that the Administrative Committee conduct an independent medical examination of plaintiff.  Id.

The Court considers the parties' arguments below.  In Part A, the Court addresses the Plan's interpretation of "Total Disability."  In Part B, the Court determines whether the Plan disregarded credible evidence of disability and initiated result-driven peer reviews.  Finally, in Part C, the Court

examines the Plan's failure to hold a conference call with Dr. Oglesby and to request an in-person medical examination.

### A.

In <u>Torix</u>, 862 F.2d at 1430, the court addressed the question of what constitutes a reasonable interpretation of plan terms.  The plan at issue narrowly defined total disability, in that a claimant qualified as totally disabled only if he or she was prevented from engaging in any occupation or employment for wages or profit for at least six consecutive months.  <u>Id.</u> at 1429.  The court rejected the plan administrator's absolute and literal reading of the plan's restrictive terms.  <u>Id.</u> at 1431.  "[A] reasonable interpretation of a claimant's entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of all the circumstances."  <u>Id.</u>  Under this standard, the claimant has the onus of establishing a physical inability to perform any occupation from which he or she can earn a reasonably substantial income. <u>Id.</u>  "If plaintiff meets [t]his burden," the court concluded, "recovery may not be denied on the basis of overly restrictive interpretations of the plan's language."  <u>Id.</u>

Here, plaintiff claims that the Plan's interpretation of the term "Total Disability" was overly restrictive and failed to account for the practical and economic realities of her circumstances.  She claims she is incapable of obtaining gainful employment, and that "the primary reason is because of the long term effect of her employment" at TWC.  Dkt. # 22, at 26.  Plaintiff claims that based on Dr. Young's testimony during the SSA hearing, she "has about as much chance getting one of the[] [520] jobs [available in Oklahoma] as [her attorney] ha[s] of winning Wednesday night's lottery."  <u>Id.</u> at 24-25.  Plaintiff claims that the fact that the Plan believes "she might be able to do some sort of mythical job out there" shows "an unreasonable interpretation of the term 'total

disability' and does not take into consideration all of the circumstances as required by the Tenth Circuit and ERISA's public policy considerations." Id. at 25.

The Court finds that the Plan's interpretation of "Total Disability" is reasonable and comports with Tenth Circuit precedent. The Torix test is not whether the Plan considered plaintiff's ability to obtain a "mythical job." The test is whether the Plan considered plaintiff's "ability to pursue gainful employment in light of all the circumstances." Torix, 862 F.2d at 1431. The Court finds that the Plan did. Unlike in Torix, the Plan's interpretation was not so narrow that "benefits could only be paid if the claimant had 'no conscious life.'" Helms v. Monsanto Co., 728 F.2d 1416, 1420 (11th Cir. 1984), cited with approval in Torix, 862 F.2d at 1429-30. Instead, the Plan required plaintiff to produce current objective medical documentation that she could not engage in any gainful occupation for which she was reasonably fitted by education, training, or experience. At bottom, plaintiff's real issue is not with the breadth of the Plan's interpretation of its terms, but with its ultimate conclusion based on the medical evidence. The Court concludes, therefore, that the Plan's interpretation of the term "Total Disability" was not overly restrictive.

## B.

In Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003), the United States Supreme Court held that plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Nevertheless, the Court also found that ERISA does not require plan administrators to accord automatic special weight to the opinions of treating physicians or to carry "a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id. Therefore, absent such requirements in a plan's provisions, the courts should not apply a "treating physician rule."

25

Plaintiff argues that the Plan ignored credible evidence of disability, including the reports of plaintiff's treating physicians and plaintiff's own assessment of her impairment.[12]  Dkt. # 32, at 7, 10, 12.  Plaintiff argues that the Plan should have given greater weight to Dr. Oglesby's assessments than to the views of professionals hired by the Plan.  Id. at 11.  According to plaintiff, the record reveals no improvement in her condition between July 1999 and the date plaintiff's LTD benefits claim was denied.[13]  Id. at 5.

The Court finds that the Plan did not ignore credible evidence.  As noted in Black & Decker, 538 U.S. at 834, the Plan did not have to accord special weight to the opinions of plaintiff's treating physicians or to explain why it credited certain reliable evidence over Dr. Oglesby's evaluations.  "[I]f a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'"  Id. at 832.  While the Plan's

---

[12]     Plaintiff also asserts the conclusory and unsupported argument that the ALJ's finding that plaintiff's impairments qualified as "severe" under the Social Security Act somehow impacts the Court's inquiry.  Dkt. # 32, at 6.  Unless the Plan's language specifically required the Plan Administrator to defer to SSA decisions, which the Plan does not, the Plan was not bound to the ALJ's finding.  See Wilcott v. Matlack, Inc., 64 F.3d 1458, 1461 (10th Cir. 1995) (finding that plan administrator's refusal to award benefits based on SSA's determination was arbitrary and capricious, because plan included specific language deferring to SSA's decision); Wagner-Harding v. Farmland Indus. Inc. Employee Ret. Plan, 26 Fed. Appx. 811, 817 (10th Cir. 2001) (unpublished decision) (finding that SSA determinations do not compel automatic awards of ERISA benefits and "are entirely different and separate from a claim under ERISA, with different parties, different evidentiary standards, and different bodies of law governing their outcomes.").  Moreover, plaintiff concedes that an SSA "award of disability is not controlling."  Dkt. # 32, at 12.  Thus, the Plan only had to consider the SSA decision in its review of the entire administrative record, which it did.

[13]     Plaintiff also appears to contend that because she initially satisfied the first tier definition of "Total Disability," which is a lower threshold, and because the record shows no improvement in her condition, ipso facto, she satisfies the heightened second tier definition of "Total Disability."  See Dkt. # 32, at 11.  This argument is perplexing, given that the latter definition requires a more severe impairment than the former.

decision should and did take into account the opinions of plaintiff's treating physicians, the Plan also considered the opinions of the four reviewing doctors, who all concluded that the record contained insufficient objective medical evidence to support a finding of "Total Disability." In its August 29, 2003 letter to plaintiff, the Plan explicitly stated that it had considered the reports of "at least eight doctors, including four orthopedic surgeons and [plaintiff's] own physician, Dr. Oglesby, and the decisions of both the Workers' Compensation Court and the Administrative Law Judge for the Social Security Administration." A.R. at 2. The Plan found that the all of the documents were "consistent on one point. None of them conclude that [plaintiff] cannot do any job . . . for which her computer skills and experience make her reasonably fitted . . . ." Id.

In essence, the crux of plaintiff's argument appears to be that the Plan could not reasonably deny her LTD disability benefits because it had (i) objective medical evidence for years 1999 through 2001 that showed she had functional impairments precluding her own occupation as a computer analyst, see Dkt. # 32, at 3-8, 10, (ii) an October 2002 assessment that plaintiff's psychological problems prevented a normal workday and workweek, id. at 7, (iii) an October 2002 assessment that plaintiff's carpal tunnel symptoms had worsened with the onset of fibromyalgia, id., and (iv) a September 2002 assessment that plaintiff had degenerative joint disease, was struggling with depression, and had experienced a worsening of symptoms, id. at 7-8. Yet plaintiff's argument ignores the Plan's repeated requests for current and objective medical data. The Plan informed plaintiff no fewer than three times that her LTD benefits would be discontinued unless she corroborated her disability claim with supporting evidence such as MRI or x-ray findings, EMG nerve conduction study findings, or a complete physical examination with ranges of motion, motor strength testing, and neurologic evaluation. See A.R. at 27, 249, 282. The Plan wanted to know

whether plaintiff had a functional impairment precluding <u>any gainful employment in 2002</u>.  At that time, the Plan was not concerned with whether plaintiff met the Plan's first tier definition of "Total Disability" in 1999, 2000, or 2001.  In sum, plaintiff had to prove her entitlement to continuing benefits under the more rigorous standard, and she had to do so with more than subjective medical opinions.  This she failed to do.  Thus, the Court finds that the Plan's weighing of the evidence was not arbitrary and capricious.

Further, the Court finds that there is no evidence in the administrative record substantiating plaintiff's claim that the four peer reviews were result-driven, conclusory, or not supported by substantial evidence.  Plaintiff provides no citation to authority, and the Court has been unable to locate any, requiring peer reviews to meet minimum page requirements or to enumerate the exact medical records reviewed.  Moreover, all four of the peer reviewing doctors clearly stated the primary reason for their conclusions: There was no current objective medical documentation showing that plaintiff could not perform any occupation for which she was qualified.  <u>See</u> A.R. at 246, 274, 276, 292.  The fact that Dr. Blumberg reviewed only Dr. Oglesby's 2002 reports, which throughly summarized plaintiff's medical history and symptoms, does not render his report conclusory or unsupported by substantial evidence.  Further, neither ERISA nor the terms of the Plan require in-person medical examinations or peer-to-peer consultations with treating physicians. <u>Gaither</u>, 388 F.3d at 771 (noting that "the minimum standards of ERISA" and the terms of the plan itself control the arbitrary and capricious inquiry).  Finally, to the extent plaintiff claims that Dr. Wallquist's peer review contains misstatements and half truths, <u>see</u> Dkt. # 22, at 19, plaintiff is incorrect.  The Court has laboriously reviewed all 409 pages of the administrative record and finds that Dr. Wallquist did not ignore evidence or misstate other doctors' findings.  Rather, Dr. Wallquist

simply did what he was asked to do: state <u>his own medical opinion</u> as to what the records established regarding plaintiff's functional impairments.  Plaintiff's mere speculation about result-driven reports will not suffice. The Court concludes, therefore, that the doctors' peer reviews were supported by substantial evidence.

## C.

In <u>Gaither</u>, 388 F.3d at 773, the court established "the narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory."  The court found that the claims review process should not be adversarial.  <u>Id.</u> at 774.  If a plan administrator believes more information is needed to make a reasoned decision, it should ask for it.  <u>Id.</u>  Although a plan administrator need not "pore over the record for possible bases for disability that the claimant has not explicitly argued, or consider whether further inquiry might unearth additional evidence when the evidence in the record is sufficient to resolve the claim one way or the other[,]" <u>id.</u> at 773, a plan administrator faced with "a claim that a little more evidence may prove valid should seek to get to the truth of the matter[,]" <u>id.</u> at 774.

Plaintiff argues that the Plan Administrator played an adversarial role.  Plaintiff argues that she bore all of the responsibility for compiling the record and yet the Plan was never "satisfied" with her submissions.  Dkt. # 22, at 28.  Plaintiff further argues that the Plan "simply close[d] the door" when she attempted to submit additional evidence of disability via the conference call with Dr. Oglesby.  <u>Id.</u>  According to plaintiff, "a little more evidence from Dr. Oglesby might have gotten to the truth of the matter."  <u>Id.</u>

The Court finds that plaintiff's argument is without merit.  <u>Gaither</u> did not obligate the Plan to hold a conference call with Dr. Oglesby when it had sufficient evidence to resolve plaintiff's claim "one way or the other."  388 F.3d at 773.  Although the Plan initially requested the conference call, it subsequently determined that the call was not necessary in light of the substantial evidence already in the administrative record.  In essence, the Plan determined that it did not need Dr. Oglesby to rehash his written findings from September 2002.  Plaintiff was not claiming prior to the conference call request, moreover, that a "little more evidence" might have uncovered her total disability.  To the contrary, plaintiff submitted her second-level appeal with no evidence enclosed. The Plan did not act as an adversary but instead repeatedly asked for current objective medical documentation that might confirm plaintiff's entitlement theory.

Therefore, the Court finds that the Plan's decision to terminate LTD benefits was predicated on a reasoned basis and supported by substantial evidence.  The Plan's decision was not arbitrary and capricious and should be affirmed.

**IT IS THEREFORE ORDERED** that defendant's August 29, 2003 final decision to terminate plaintiff's LTD benefits is hereby **affirmed**.  A separate judgment is filed herewith.

**DATED** this 27th day of June, 2008.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

30